IN THE UNITED STATES DISTRICT
COURT FOR THE NORTHERN DISTRICT
OF TEXAS -- DALLAS DIVISION

| | | |
|---|---|---|
| NeuroRestorative-MI, LLC d/b/a<br>NeuroRestorative Michigan | §<br>§<br>§<br>§<br>§ | |
| *Plaintiff,* | §<br>§ | |
| V. | §<br>§ | Case No. 3:26-cv-2468 |
| UMR, Inc. HKS, Inc. & HKS, Inc.<br>Employee Benefit Plan | §<br>§<br>§<br>§<br>§ | |
| *Defendant.* | | |

## PLAINTIFFS' ORIGINAL COMPLAINT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW, NeuroRestorative-MI, LLC d/b/a NeuroRestorative Michigan ("NRMI" or "Plaintiff"), by and through its undersigned counsel, complains of Defendants UMR, Inc. ("UMR"), HKS, Inc. ("HKS"), and the HKS, Inc. Employee Welfare Benefit Plan (the "Plan") and would show the Court as follows:

**I.**

## INTRODUCTION

1.     This is an action to recover benefits due under an employee welfare benefit plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.* and for payment to the Plaintiff of benefits

pursuant to a claim for breach of contract. The Plaintiff, NRMI, provided medically necessary post-acute neuro-rehabilitation residential services to a Plan member and beneficiary ("the Patient") that had benefits and coverage under a HKS Plan from February 6, 2024, through May 2, 2024 and who on in information and belief was an employee, dependent or spouse that was employed with HKS, Inc., and that had health benefits and coverage under the HKS Benefit Plan.  Plaintiff brings this cause of action complaining of the HKS Plan and the HKS Medical Care Plan in its capacity as plan sponsors, plan administrators or claim administrators of health insurance plans and/or employee welfare benefit plans in connection with HKS's role as the insurer and/or administrator of health insurance and health plan products that it offered to employees. UMR, Inc. was on information and belief the third-party claims administrator that administered the Plan that provided the medical benefits and coverage to the Patient. Additionally, UMR entered into an agreement on the behalf of the Plan with the Plaintiff and processed and paid and/or refused payment for the claims in question.  Thus, Plaintiff also brings this action complaining of UMR, Inc., as the administrator of the plan and the actual health benefit Plan in its capacity as plan sponsor, plan administrator or claim administrator of health insurance plan and/or employee welfare benefit plan in connection with Defendant, HKS, Inc. in its role as the insurer and/or administrator of health insurance and health plan products that it offered to employee.

2.      All of the services that were provided were preauthorized before the services were provided. The Plaintiff provided the services and submitted the claims for payment. Despite this written authorization, UMR and the Plan delayed adjudication for

months, issued repeated improper denials while paying nothing at all. Ultimately, the Plaintiff was paid only $5,768.14 of the $152,250.00 billed for the valuable services provided to the Plan member that had suffered a traumatic brain injury.  The effective reimbursement resulted in the payment of pennies on the dollar that bears no reasonable relationship to the agreed-upon in-network level of benefits or the value of the services provided.  Plaintiff seeks recovery of the full unpaid balance of $146,481.86, plus interest, attorneys' fees, and costs under ERISA § 502 and as a result of the Defendants breaching their agreement to properly reimburse the Plaintiff for the out-of-network services provided to the Patient.

3.    Pursuant to patient privacy laws, the Patient will not be identified in these pleadings by name or other personal information that is protected under state and federal law.  Defendants have already been notified in this disputes and information sufficient to identify the claims is attached hereto as Exhibit A with all personal information redacted or omitted.  Additional information will be provided to the Defendants, if so requested, to further identify the Patient and the claims made the basis of this dispute.

4.    As grounds for their complaints and causes of action, Plaintiff would respectfully show this Honorable Court the following:

**II.**

**<u>PARTIES</u>**

5.    Plaintiff, NRMI, is a Michigan limited liability company with its principal place of business in Farmington Hills, Michigan. NRMI operates a post-acute neuro-

rehabilitation facility specializing in treatment for individuals who have suffered traumatic brain injuries.

6.      Defendant UMR, Inc. is a third-party claims administrator that administered the Plan provided the medical benefits and coverage to the Patient and on behalf of HKS.  At all times relevant hereto, UMR was acting as the actual or ostensible agent of the HKS plan. Defendant UMR, Inc. is a corporation organized under the laws of the State of Wisconsin, with its principal place of business in Wausau, Wisconsin and that operates in the state of Texas and nationwide administering health benefit plans. It is a wholly-owned subsidiary of UnitedHealth Group, Inc. UMR, Inc. may be served with process by serving its registered agent for service, the Texas Commissioner of Insurance, 333 Guadalupe Street, Austin, Texas 78701.

7.      Defendant HKS, Inc. is a Texas corporation with its principal place of business in Dallas, Texas. HKS sponsors the self-funded Plan and may be served by delivering a copy of the summons and of the complaint to its registered agent for service, CT Corporation System at 1999 Bryan St., Suite 900 Dallas, Texas 75201-3136.

8.      Defendant, the HKS, Inc. Employee Welfare Benefit Plan is an employee welfare benefit plan within the meaning of ERISA § 3(1), 29 U.S.C. § 1002(1), sponsored by HKS and administered by UMR and may be served by delivering a copy of the summons and of the complaint to its registered agent for service, CT Corporation System at 1999 Bryan St., Suite 900 Dallas, Texas 75201-3136.

**III.**

## JURISDICTION AND VENUE

9.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 and ERISA § 502(e), 29 U.S.C. § 1132(e), because this action arises under federal law.  This Court also has supplemental jurisdiction over Plaintiff's state law breach of contract claims against Defendants, because these claims are so related to Plaintiff's federal claims that the state law claims form a part of the same case or controversy under Article III of the United States Constitution. The Court has supplemental jurisdiction over these claims pursuant to 28 U.S.C. § 1367(a).

10.     Venue is proper in the Northern District of Texas, Dallas Division, pursuant to 28 U.S.C. § 1391 and ERISA § 502(e)(2) because the HKS Defendants reside in this District and have their principal place of business in Dallas, Texas, and the HKS Plan is believed to have been administered in this District.

**IV.**

## FACTUAL ALLEGATIONS

11.     Plaintiff, NRMI, is a post-acute neuro-rehabilitation facility, which provides therapy and rehabilitation services to people that have suffered traumatic brain injuries. The Plaintiff provided medically necessary post-acute neuro-rehabilitation residential services to the Patient that had benefits and coverage under the Defendant, HKS Plan.  Initially, the Patient was admitted and treated at a NeuroRestorative facility

that was located in Garland, Texas from October 4, 2023 until February 06, 2024 after the Patient suffered a traumatic brain injury. The Texas NeuroRestorative facility that treated the patient was directly contracted with and in network with United and UMR. As a result, the claims for the services that were provided in Texas were submitted and timely and properly paid at the appropriate in-network rates for the services by the Plan and the Plan Administrator.

12.   After the Patient's initial treatment in Texas and the progress made there, the Patient and the Patient's family sought to have the Patient transferred and admitted to the Plaintiff's facility located in Michigan (NeuroRestorative MI) in order to be closer to family while necessary treatment continued.  Prior to that transfer, NeuroRestorative MI reached out directly to UMR in order to verify benefits were available for the care in Michigan and to seek preauthorization, because the Michigan Neurorestorative facility was not directly contracted with UMR and was thus was considered out-of-network. UMR agreed to cover the services under the plan and authorized that the out-of-network care be provided and covered at an in-network level of benefits.  See authorization of the services attached hereto as Exhibit B  Thus, a contract or a single case agreement was entered into by the parties and the valuable services were provided with a certain expectation of reasonable payment for the services, which were all indeed preauthorized. The Patient was provided medical treatment at the Michigan facility from February 6, 2024 to 24 to May 2, 2024.  The total charges for the services provided to the Patient under the Agreement were $152,250.00.

13.   The claims for the medical services were submitted to the Plan and/or

UMR with the expectation of appropriate payment. Despite the written authorization entered into by UMR and representations that the claims would be paid and covered, UMR delayed adjudication for months, paid nothing, and issued repeated and unsubstantiated reasons for denying the claims. Initially, UMR paid absolutely nothing on behalf of the Plan stating in the Explanation of Benefits (EOBs) or payment remittances that services were excluded or not covered by the health plan. See Exhibit C as attached hereto as an example. This was in spite of prior representations of coverage and authorizing the care of the Patient. When the Plaintiff appealed and contacted UMR, UMR then stated for the first time that the claims were not coded or billed correctly, which is completely untrue. UMR asserted this although the claims that were previously paid for the Texas services were billed in the exact same manner and timely and properly paid. Regardless and although the claims were coded and submitted properly, the Plaintiff submitted "corrected claims" in September of 2024 just in an effort to receive payment. In November UMR again stated that the services were excluded under the Patient's plan.

14.     After further appeals, UMR and the Plan finally did reimburse or partially pay some of the claims, but in the end only paid $5,768.14 of the $152,250.00 billed and usual and customary charges for the services provided to the Plan member. See Exhibit A. The effective reimbursement resulted in the payment of pennies on the dollar that bears no reasonable relationship to the agreed-upon in-network level of benefits or the value of the services provided. The Plaintiff has attempted countless times to resolve this dispute, but UMR and the plan have refused to pay any additional monies for the

services provided. In December, the Plaintiff reached out once again, and UMR stated that the Plaintiff needed to contact Clear Health, a third-party company, which apparently re-priced the claims. Still, none of the claims for dates of service of April 1, 2024 to April 30, 2024 were paid.  The claims were appealed again and additional reimbursement was denied. After continued contact with the employer Plan, UMR and its representatives, the claims were finally adjudicated and paid.  However, the claims were drastically underpaid at an alleged out of network benefit level purportedly at 150% of Medicare, which the Plaintiff disputes on numerous grounds. The level of care provided by the Plaintiff are not covered Medicare services, and there simply is no applicable Medicare rate for the level of care provided to the Patient.  Plaintiff is not a Medicare provider.

15.    First and foremost, UMR agreed to process and pay and process the claims as in network on behalf of the plan.  UMR provided an authorization expressly stating as much.  UMR and the plan delayed payment of the claims at all for months. When the claims did finally pay after numerous bad faith denials, the amounts paid varied significantly with payment of $32.75 for an entire day of rehabilitative services for services provided in February of 2024.  Services in March were paid at rates of $32.57 a day and then $33.39 a day. When the April services were finally paid, the amount paid for each date of service was $122.52.  The *de minimus* amounts paid are entirely inconsistent and completely insufficient for the level of care provided to the Patient. NRMI's usual and customary charge for the level of residential neuro-rehabilitation services provided is $1,750.00 per day. Total charges for the dates of

service were $152,250.00. To date UMR has only paid a mere $5,768.14 for the valuable services provided to the patient. How that amount was arrived at or calculated remains a complete mystery and is completely unsubstantiated and constitutes a clear abuse of discretion and a express breach of the agreement Defendants entered into with Plaintiff.

16.     As a result, the Plaintiff seeks recovery of the full unpaid balance of $146,481.86, plus interest, attorneys' fees, and costs under ERISA § 502 and as a result of the Defendants breaching their agreement to properly reimburse the Plaintiff for the services provided.

## V.

## INACCURACIES AND MISREPRESENTATIONS IN INFORMATION PROVIDED TO PLAINTIFF

17.     The Patient elected to receive treatment from the Plaintiff, which is an out of network provider as to the Plan and/or UMR, which acts as the TPA of the Plan. However, the Plaintiff contacted UMR, and UMR on the behalf of the Plan agreed to process the claims as in network.  Yet, the Defendants represented in written communications, including in remittance advices and explanation of benefit forms ("EOBs") that the Plan was not required to pay the charges submitted by the Patient based on the express terms of any given insurance policy or employer-sponsored plan. None of those written communiqués stated with specificity any plan provisions applicable to the claims in EOBs issued to the Plaintiff on behalf of Patients or the basis or methodology for the amounts paid.

18.    Most explanation of benefit forms ("EOBs") that were received from the merely contained the following boiler plate language:

"We recently processed the claim.  The payment for out-of-network services was calculated using a formula based on generally accepted amounts and in accordance with Plan provision"; or

"Charge(s) Denied.  This Service is Excluded By your Health Plan. Refer to General Exclusions in Your Benefit Booklet.

See Exhibit C as attached hereto.

19.    It was then represented that the minuscule amounts paid were somehow paid based on a percentage of Medicare, even though the Plaintiff is not even a Medicare provider.  These repeated and completely inconsistent statement that were made to the Plaintiff and/or the Patient are simply untrue or inaccurate and the Defendants knew or should have known that such representations were not true.  The Plaintiff asserts that the Plan or their actual agents or TPA knowingly made these representations in written correspondence, including remittance advices and EOBs in order to mislead the Patient and the Plaintiff.

## VI.

### PLAINTIFF SECURED ASSIGNMENTS FROM THE PATIENT

20.    In addition to the Defendants verifying that benefits were available and adequate for the treatment in order to pay claims appropriately, the Patient made the basis of this lawsuit executed a set of documents that included an assignment of benefits that authorized payment of benefits for services rendered to or to be rendered to be made payable to the Plaintiff and also directly assigned the patient's rights and benefits under

the insurance policy direclty to the Plaintiff.   Plaintiff therefore has the right and appropriate standing (beyond its agreement with the Defendants) to pursue plan benefits as the assignee of the plan participant under ERISA and is authorized to assert an interest to reimbursement as an authorized representative of the Patient and beneficiary of the Defendant Plan.   Likewise and pursuant to  29 C.F.R § 2560.503-(b)(4)-5, the claims procedures of ERISA do not preclude an authorized representative of a claimant from acting on behalf of such claimant in pursuing a benefit claim or appeal of an adverse benefit determination.

## VII.

## **REQUESTS FROM PLAINTIFF FOR PLAN DOCUMENTS IGNORED**

21.    The actual language of the plan and methodologies underlying the Defendants (or UMR's) reimbursement practices and methodologies for processing the claims are not readily ascertainable to the Patient or the Plaintiff and are not likely known to the Defendant Plan's own customers and clients even though it is the sponsor of the Plan. As an entity with authority over ERISA plan assets, the Plan and/or UMR are required to produce health plan documents and policies it issues to employers, as well as to the beneficiaries of those plans. In the event that the Plan Sponsor or the Plan Administrator have given authority to the TPA to adjudicate claims on its behalf, the TPA is required to make appropriate disclosures to its beneficiaries including the reimbursement methodologies that are being employed.   This is required the ERISA regulations promulgated by the U.S. Department of Labor found in Title 29 of the CFR.

Such plan descriptions are required to contain the following:

a.  Cost-sharing provisions, including premium, deductible, co-insurance and co-payment amounts for which the participant orbeneficiary will be responsible.

b.  The extent to which preventive services are covered under the plan.

c.  Whether, and under what circumstances, existing and new drugs are covered under the plan.

d.  Whether, and under what circumstances, coverage is provided formedical tests, devices and procedures.

e.  Provisions governing the use of network providers; the composition of provider networks; and whether, and under what circumstances, coverage is provided for out-of-network services.

f.  Provisions requiring pre-authorizations or utilization review as a condition to obtaining a benefit or service under the plan.

29 CFR § 2520.102-3 (Emphasis added).

22.    Counsel for the Plaintiff has requested and demanded that the Plan documents be produced, and the Defendants have refused and failed to do so in violation of the law.

## VIII.

## CAUSES OF ACTION

**A)    ERISA CLAIMS**

**COUNT ONE:**
**Claim for Civil Enforcement Under 29 U.S.C. § 1132(a)(1)(B)**
**For Failure to Properly Pay ERISA Plan Benefits and Violation of Payment Obligations**

---

23.     Plaintiff alleges and incorporates herein by reference paragraphs 11 through 22 above.

24.     Individuals and enrolled dependents, who receive their health insurance through a private sector, employer-based benefit plan are generally defined as participants or beneficiaries of  plans governed by the federal Employee Retirement Income Security Act of 1974 ("ERISA"), as amended. 29 U.S.C. § 1001 *et seq*.  These "ERISA plans" are sometimes fully insured by health insurers, while in other cases the plan is self-funded, and a third, frequently used plans are designed to self-fund to a specific "attachment point", which is the dollar threshold at which excess loss insurance will indemnify the plan.  In all cases, the plan remains financially responsible for the claims arising from that plan.

25.     Plaintiff is informed and asserts that HKS and UMR are the ERISA plan administrators and the named ERISA fiduciaries for the ERISA Plan and the claims at issue in this Complaint. Defendant HKS and/or its TPA, UMR, assert direct control over the decisions of whether to prospectively approve treatment provided to its Members and beneficiaries.  Likewise, HKS and/or UMR, acting as the TPA of the Plan, ultimately determine whether to pay or deny a claim for services rendered by a medical provider to the Plan's Members.  Then afterward, reimbursement and the amounts paid are determined by the Plan and/or its TPA, including the act of determining the amount that the Plan beneficiary will be required and determined responsible to pay for their portion of their medical care expenses under the Plan's benefits.

26.    Upon information and belief and with respect to the Plan, the sponsoring employer's plans and/or third party administrator (UMR) acting as an agent of the plan perform administrative and other key responsibilities such as (a) certifying or authorizing Plaintiff's provision of services to the Patients; (b) receiving Plaintiff's claims for services provided to the Patients; (c) pricing or re-pricing the claims; (d) processing and administering the claims and appeals; (e) approving or denying the claims; (f) deciding whether or not to transfer the members to other in- network facilities; (g) directing whether and how to pay the claims; (h) issuing remittance advices and explanations of benefits; (i) communicating with Plaintiff and the Patient regarding the claims and services; (j) communicating with Patient regarding the claims and services; and (k) in almost all instances, issuing payment, except of course where the Plan or TPA deny the claim, underpay or pay absolutely nothing for the valuable services.  On information and belief, agreements between Plans such as the HKS Plan and TPAs such as UMR are structured such that the plans have a financial incentive to keep benefit costs to the funding entity low, particularly in the case where the Plan is also the liable insurer.  As a result, the costs are then passed to the members/patients and/or the medical provider that incurred the high costs for providing those professional medical services, diagnostic testing, supplies, etc.

27.    On information and belief, HKS (and its TPA) functions as an ERISA plan administrator with respect to those claims upon which it has exercised delegated authority to provide plan documents to participants and beneficiaries, receive benefit claims, evaluate and process those claims, review the terms of the plan, make

initial benefit determinations, make and administer benefit payments, handle appeals of benefit determinations, and serve as the primary point of contact for Members and Providers in order to communicate to each details regarding benefits and benefit determinations. In carrying out these ERISA plan administrator functions, Defendants possess the authority and fiduciary discretion to manage and administer the ERISA plans. At all times relevant to this action, the TPA of the Plan, UMR, was acting as the agent of each of the insured or self-funded employee benefit plan and entered into an agreement to act as the third-party administrator on the Plan's behalf and to provide administrative services relating to the HKS employer-sponsored health plan established under ERISA. As such, UMR was acting as agent for its principal (HKS) with actual or apparent authority to transact business with third parties, including Plaintiff, on behalf of HKS, in turn making HKS either contractually or vicariously liable for the acts and/or omissions of its agents.

28.      Employee Welfare Benefit Plans established pursuant to ERISA, whether fully insured or self-funded, typically contain provisions for paying non-contracted medical providers, physicians, hospitals and other categories of medical care providers at the usual, customary and reasonable rate ("UCR"). The language and acronyms vary somewhat from plan to plan and may be described as the "Recognized Charge", "Usual, Customary and Reasonable" rate, the "Reasonable and Customary" amount, the "Reasonable Charge," the "Prevailing Rate," the "Usual Fee," the "Competitive Fee," or some other similar phrase. In the context of the healthcare industry, these phrases are all synonymous with the usual and customary rate. Upon information and belief, no

provisions in the Plan's applicable to the services provided to the Members made the basis of this immediate lawsuit dictated the rate of reimbursement employed by the Plan as the Members' claims. Plaintiff cannot say with any certainty as the Defendants have refused to provide plan documents despite multiple requests.  The Plaintiff's charges are usual, customary, and reasonable under the legal standards applicable to defining "reasonable and customary" or "fair market value".

29.     The formal mechanism for a health plan or plan administrator to  explain why a claim is denied (meaning that the allowed amount is anything less than full-billed charges) is an explanation of benefits ("EOB").  Defendants were required to issue EOBs in conformance with 29 U.S.C. § 1133 as implemented by 29 C.F.R. 2560.503-1. Specifically, under 29 C.F.R. § 2560.503-1(g), they were required to:

> provide a claimant with written or electronic notification of any adverse benefit determination. Any electronic notification shall comply with the standards imposed by 29 CFR 2520.104b-1(c)(1)(i), (iii), and (iv).The notification shall set forth, in a manner calculated tobe understood by the claimant –

> (i)     The specific reason or reasons for the adverse determination;

> (ii)     Reference to the specific plan provisions on whichthe determination is based;

> (iii)     A description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information isnecessary;

> (iv)     A description of the plan's review procedures

and the time limits applicable to such procedures, including a statement of the claimant's right to bring a civil action under section 502(a) of the Act following an adverse benefit determination on review;

(v)     In the case of an adverse benefit determination by a group health plan or a plan providing disability benefits.

(vi)     If an internal rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination, either the specific rule, guideline, protocol, or other similar criterion; or a statement that such a rule, guideline, protocol, or other similar criterion was relied upon in making the adverse determination and that a copy of such rule, guideline, protocol, or other criterion will be provided free of charge to the claimant upon request; or,

(vii)     If the adverse benefit determination is based on a medical necessity or experimental treatment or similar exclusion or limit, either an explanation of the scientific or clinical judgment for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that such explanation will be provided free of charge upon request.

(viii)     In the case of an adverse benefit determination by a group health plan concerning a claim involving urgent care, a description of the expedited review process applicable to such claims.

30. Strict compliance with these requirements is now necessary, and only *de minimis* errors will be excused. 29 C.F.R. § 2590.715-2719(b)(2)(ii)(F)(1). The errors made here by Defendants were not *de minimis* and indeed were not errors at all, but

rather intentional underpayments or refuses to pay anything at all.

31. After the Plaintiff provided medical care to the Patient, who was a beneficiary of the HKS Plan, HKS submitted claims to be processed and paid. Plaintiff alleges that the Defendant Plan and UMR have failed to reimburse the Plaintiff properly. Rather, the Plan improperly denied the claims completely without proper grounds or justification, delayed processing and payment and ultimately paid only pennies on the dollar for the valuable services provided. When each of the relevant claims were denied or underpaid, the Defendants (or the TPA for the Plan) generated claim details offering only vague and non-specific explanations on the EOBs for why the claims would not be properly paid, underpaid or not paid at all such as:

> "We recently processed the claim. The payment for out-of-network services was calculated using a formula based on generally accepted amounts and in accordance with Plan provision"; or

> "Charge(s) Denied. This Service is Excluded By your Health Plan. Refer to General Exclusions in Your Benefit Booklet.

See Exhibit C.

These explanations were not only vague but are nonsensical. For example, the EOB's explained that the claims were excluded under the plan (although the services were preauthorized) or provided only vague unsupported explanations for the amounts that were actually paid after the claim were denied. This was asserted even after the services were authorized and it was represented that the claims were covered and would be paid as in network benefits. The Plan's EOBs did not comply with ERISA regulations, including not stating the specific and/or actual reasons for its failure to pay claims at the

rate based on the express terms of an ERISA plan or to deny the claims for medically necessary services provided to the Members. The HKS Plan's EOBs failed to provide details required by law or offer to provide more information if needed, as required by law.

32.   Plaintiff is informed and believes that in many cases, Plans such as the Defendant require the Plan to reimburse the Plaintiff at its usual, customary and reasonable rates for services provided to the ERISA plan participants and beneficiaries or pursuant to plan provisions that were not followed, which has resulted in greater personal costs to the Patient and the medical provider Plaintiff, both of which are compelled to absorb those costs. The Plaintiff alleges that the Defendants breached applicable plan provisions and failed to provide the full measure of coverage and benefits due under the Plan. This resulted in less coverage for the Patient in violation of the law and the actual Plan benefits and resulted in significant damages to the Plaintiff as a medical provider, assignee of the Patient and as the designee to pursue legal remedy.

33.   Plaintiff as a provider, assignee and acting herein as legal representative of the Patient, has exhausted all administrative remedies under the ERISA plans at issue. For the underpaid claims that are subject to ERISA, Plaintiff either submitted timely written appeals pursuant to 29 U.S.C. § 1133, or are excused from exhausting their administrative remedies, because the Defendants failed to follow claims procedures required by ERISA and its implementing regulations and any such appeals would be futile. *See* 29 C.F.R. § 2560.503-1. If full exhaustion under any certain plan provision(s) may not have been fully completed, such completion or "exhaustion" is excused, because

the appeal process was not followed by the plans and would therefore have been futile.

An objective review of the administrative appeals also reflects that Defendants never

agreed to any meaningful review or modification of its original coverage and payment

decisions on any of the claims for services rendered.  Since the Plaintiff participated in

these processes to the degree possible without the benefit of plan documents, the Plaintiff

alleges that the administrative records will also show a lack of compliance with plan

administration requirements found in the regulations of the Department of Labor for

ERISA governed health plans.

34.     UMR either serves as the named plan administrator or the designated Plan

administrator's "designee" for the plans at issue or exercises discretion and control over

the payment of plan benefits and the determination of the amounts to be paid and acting

as the agent of the Defendant Plan.

35.     Defendants' failure to pay what was obligated payment for care provided to

Patient was motivated solely by the desire to achieve maximum profits and constitutes a

conflict of interest and bad faith and to the damage of the Patient/Member and Plaintiff

medical provider that has yet to be reimbursed for the valuable services provided

36.     Defendants also authorized the Plaintiff to provide the care and entered into

an express agreement to pay for the services.  Even with an implied-in-law agreement

exists, and no specific payment terms have been agreed upon or are in dispute, payment

for the services is based upon the reasonable and customary fair market value.

37.     Plaintiff's charges are usual, customary, and reasonable under the legal

standards applicable in defining "reasonable and customary" or "fair market value" and

as defined by law and industry standards.

38.     The Defendants have violated the plain terms of the health Plan and abused discretion in administration of the plans at issue by significantly underpaying claims for the out-of-network services provided to the Patient, particularly since Defendants agreed in writing to process the claims as in network. Defendants have failed to remit any semblance of reasonable payment for the claims pr at the usual and customary level that the plans typically require for the benefit of the member.  Defendants' conduct, acts and omissions constitute a breach of the ERISA plans and an abuse of discretion.  Such conduct has denied the Plaintiff benefits to which it and the Patient are entitled and for services that were preauthorized and approved and represented to be covered.

39.     As assignee of the benefits and/or the authorized legal representative of the Patient, the Plaintiff is entitled to the recovery of benefits and all other relief due pursuant to 29 U.S.C. § 1132(a)(1)(B).

40.     Defendants' failure to pay the authorized in-network benefits was arbitrary, capricious, and an abuse of discretion. Thus, the Plaintiff is entitled to recover under 29 U.S.C. § 1132(a)(1)(B) for the difference between the *de minimus* benefits that were actually tendered to Plaintiff for the valuable services provided to the Patient and the amounts that should have been paid and provided for the valuable services provided, plus applicable pre and post judgment interest and reasonable attorneys' fees as awarded at the discretion of the Court.  The Plaintiff thus seeks recovery of coverage and benefit amounts of not less than the balance of its usual and customary services that were provided in the amount of $146,481.86

## COUNT TWO

## ERISA § 502(a)(3) – EQUITABLE RELIEF / BREACH OF FIDUCIARY DUTY

41. Plaintiff alleges and incorporates herein by reference paragraphs 11 through 40 above.

42. As set forth above, UMR and HKS, as plan administrator and/or fiduciary, breached their fiduciary duties by failing to honor the written authorization, engaging in unreasonable delays, and applying arbitrary and capricious reimbursement methodologies.

43. Plaintiff is thus entitled to equitable relief, including surcharge, restitution, and/or disgorgement under ERISA § 502(a)(3).

### B) STATE LAW CLAIMS

## COUNT THREE

## BREACH OF CONTRACT

44. Plaintiff alleges and incorporates herein by reference paragraphs 11 through 43 above.

45. As described above, the Defendants authorized the services and necessarily agreed to pay for medical services and care provided by Plaintiff to Patient. The Plaintiff contacted the Defendant when the patients were admitted, and Defendant represented coverage was available and authorized the services to be provided. See Exhibit B. Said services were provided and the Defendants failed to pay anything at all

for months alleging that the services were excluded under the Plan. Ultimately, the Defendants did remit some reimbursement but only paid pennies on the dollar for the services paying only have failed to pay amounts that are due and owed. The authorization letter and single-case agreement constitute enforceable contracts under which Defendants agreed to process and pay NRMI's claims at in-network benefit levels. Defendants breached those agreements by not promptly paying and paying only a mere $5,768.14 of the charges that totaled $152,250.00. Defendant's non-performance in failing to pay any monies or failing to pay a reasonable rate for the claims constitutes a material breach of the parties' agreements. Alternatively, the parties entered into an implied-in-fact contractual agreement, which can clearly be inferred from the industry standards described above, the parties conduct, and the surrounding circumstances involved for the admission.

46.     The Plaintiff has been damaged in the amount of the balance of its billed and usual and customary charges, in an amount of $146,481.86, which is reasonable reimbursement for the services provided. All conditions precedent to Defendant's obligations of payment have occurred as required by the Texas Rules of Civil Procedure.

## IX.

### **Attorney's Fees**

47.     Plaintiff has presented its claims for payment to Defendant for the above-mentioned services rendered to the patients. Defendant has failed to tender payment of the just amount owed to Plaintiff, and Plaintiff is entitled to reasonable attorney's fees to be determined by the trier of fact pursuant to §1132(g)(1) of ERISA.

## DEMAND FOR JURY TRIAL

48.    Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully prays and that this Court enters judgment in its favor of Plaintiff and against Defendants, jointly and severally, as follows:

a. An order requiring Defendant to pay Plaintiffs actual damages to fully compensate them for losses sustained because of Defendant's breaches, abuse of discretion and/or unlawful conduct and Award the full unpaid balance of $146,481.86 or restitution in the amount of the benefit(s) wrongfully and unlawfully denied and withheld by the Defendants;

b. Award reasonable attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g);

c. Award equitable relief, including surcharge or restitution as appropriate;.

e.  Award Pre-judgment and post-judgment interest to the extent allowed by law; and

f.  Award and grant such other and further relief as the Court deems just and proper and award such costs and further relief as this Court deems appropriate.

Respectfully submitted,

LAW OFFICES OF P. MATTHEW O'NEIL


By        /s/ P. Matthew O'Neil
          P. MATTHEW O'NEIL
          State Bar No. 00795955
          6514 McNeil Dr.
          Bldg. 2, Suite 201
          Austin, Texas 78729
          moneil@mattoneillaw.com
          (512) 473-2002 Telephone
          (512) 473-2034 Facsimile
          ATTORNEY FOR PLAINTIFFS